IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MILTIADIS A. MILTIADOUS, | : | CIVIL ACTION |
| | : | NO. 08-5381 |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| INNA TETERVAK, | : | |
| | : | |
| Respondent. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    FEBRUARY 19, 2010

## I. Introduction

This is a Petition for Return of Children brought
pursuant to the Hague Convention.[1]  Miltiadis Achillea
Miltiadous, the father ("Petitioner"), filed for a petition for
the return of his two children from the United States to Cyprus.[2]
Inna Tetervak, his wife and the mother ("Respondent") of the
children, contends that the United States is the children's
"habitual residence," and that the children's return to Cyprus

---

[1]     Hague Convention on the Civil Aspects of International
Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501.

[2]     Cyprus, officially the Republic of Cyprus, is an island
country in the Eastern Mediterranean Sea.  A member of the
European Union, it is partitioned into two main parts, the area
under the effective control of the Republic of Cyprus, comprising
about 59% of the island's area and the Turkish-occupied area in
the north.  The largest ethnic groups are Greek and Turkish,
which are also the official languages of the country.  The
pertinent events in this case took place in the area controlled
by the Republic of Cyprus. Cyprus, Encyclopædia Britannica.
Retrieved February 18, 2010, from Encyclopædia Britannica Online:
http://www.britannica.com/EBchecked/topic/148573/Cyprus.

would expose them to a grave risk of physical or psychological harm.  For the reasons discussed below, the Court will deny the petition.

Having heard the evidence and arguments presented by the parties, the Court makes the following findings of fact and conclusions of law.

## II. Findings of Fact[3]

Petitioner is a citizen of Cyprus and Respondent is a Russian citizen.  The two met in Cyprus in 2000 while the Respondent was in Cyprus on a worker's visa.  After a brief courtship, Petitioner and Respondent were married on November 29, 2000, in Aradippou, Cyprus, and continued to live together in Cyprus until November 23, 2007.  After her marriage to Petitioner, Respondent had temporary resident status in Cyprus that was dependent upon Petitioner signing her visa yearly.

Petitioner and Respondent had two children together, Iliana Miltiadous and Achilleas Miltiadous (jointly referred to as the "children"), born on August 24, 2002, and March 29, 2004, respectively.  The children were born in Cyprus and are Cyprus citizens.  At the time the instant motion was filed, the children were six and four years old, respectively.

---

[3]     The historical facts are largely uncontested.  Where contested, the Court credits the testimony of the Respondent. The Court finds the Petitioner's testimony evasive, hostile and generally not credible.

Petitioner and Respondent experienced a violent and tumultuous relationship throughout their marriage. Petitioner was an "avid drinker and habitual drug user," and physically and psychologically abused Respondent "almost throughout the duration of their marriage." (Resp., doc. no. 9 at 13) Although Petitioner has never physically harmed the children, he has "always harassed the children by yelling at them and threatening them that he would take them away and they would never see their mother again." (Id.)

On November 23, 2007, the family departed for a temporary vacation to visit extended family in the United States. Return airline tickets were purchased; Petitioner was to return to Cyprus on January 20, 2008, and Respondent and both children were to return on February 24, 2008.

While the family was visiting Respondent's parents in the United States, Petitioner's abusive behavior continued. On December 1, 2007, Petitioner returned to Respondent's parents home drunk and aggressive. Respondent called the police on December 1, 2007, and Petitioner left to stay with his cousins in New Jersey.

Petitioner was served with a "Notice of Hearing and Order" for temporary restraints, issued by the Pennsylvania Court of Common Pleas on December 10, 2007. On December 14, 2007, after a hearing at which both Petitioner and Respondent were

represented by counsel, Respondent obtained a Protection from Abuse Order from the Court of Common Pleas in Philadelphia, ordering Petitioner to stay away from Respondent, granting Respondent sole custody of the children, and allowing Petitioner weekly supervised visitation rights with the children. Despite this order, on December 21, 2008, Petitioner called Respondent and left a threatening voicemail, urging her to stop the legal proceedings. Thereafter, Respondent called the police and a warrant was issued for Petitioner's arrest.

Respondent filed for political asylum in the United States on May 9, 2008, seeking permanent asylum for herself and her children due to the fear of imminent physical and mental abuse by her husband in Cyprus. (Doc. no. 9, Ex. 2). On July 22, 2009, Respondent was granted asylum and her children's immigration status is derived from hers. Trial Tr. at 7:19-21, Oct. 29, 2009. Respondent and the children currently reside with her parents in Philadelphia, Pennsylvania.

Since returning to Cyprus, Petitioner has spoken with Respondent by telephone and requested that she voluntarily allow the children to return to Cyprus. Respondent has refused this request. On November 14, 2008, Petitioner filed an "Application for Assistance Under the Hague Convention on Child Abduction from Cyprus to the Central Authority of the United States of America: Request for Return of Child Under Article 12 of the Convention."

(Doc. no. 1.) In addition, Petitioner is pursuing legal action in Cyrus for Respondent's retention of the children in the United States without Petitioner's consent.[4]

## III. Legal Standard under the Hague Convention

### 1. Background

The Hague Convention on the Civil Aspects of International Child Abduction reflects a universal concern about the harm done to children by parental kidnaping and a strong desire among the Contracting States to implement an effective deterrent to such behavior. Hague Convention, Preamble, 42 U.S.C. § 11601(a)(1)-(4). The United States and Cyprus are signatories to this multilateral treaty. The United States Congress implemented the Convention in the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq.

Pursuant to the preamble of the Hague Convention, there are two main purposes of the Convention: (1) "to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed;" and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." The Convention's procedures are not designed to settle

_____

[4] This case has been subjected to substantial briefing by the parties, numerous status conferences and two evidentiary hearings. The case became ripe for adjudication on December 8, 2009.

5

international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.  <u>Baxter v. Baxter</u>, 423 F.3d 363, 367 (3d Cir. 2005).

### 2. Petitioner's Burden

Any person seeking the return of a child in the United States may commence a civil action under the Convention by filing a petition in a court of the jurisdiction in which the child is located.  42 U.S.C. § 11603(b).  To obtain an order for the child's return under the Hague Convention, the petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was "wrongful" under Article 3.  42 U.S.C. § 11603(e)(1)(A).[5]

Specifically, a petitioner must show: (1) the child was habitually residing in one State and has been removed to or retained in a different state; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

---

[5]    Under Article 3 of the Hague Convention, the removal or retention of child is "wrongful" where: (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. Hague Convention, art. 3.

42 U.S.C. § 11603(e)(1)(A).

The Third Circuit highlights these requirements and notes that wrongful removal or retention claims under Article 3 of the Convention typically raise four questions: "(1) When did the removal or retention at issue take place?; (2) Immediately prior to the removal or retention, in which state was the child a habitual resident?; (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?; and (4) Was the petitioner exercising those rights at the time of the removal or retention?" Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006)(citing Baxter, 423 F.3d at 368).

### 3. Habitual Residence

A petitioner cannot claim that the removal or retention of a child is "wrongful" unless "the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in a different State." Karkkainen, 445 F.3d at 287 (quoting Gitter v. Gitter, 396 F.3d 124, 130 (2d Cir. 2005)). Therefore, determination of a child's habitual residence is a threshold question in deciding a case under the Hague Convention. Id. (citing Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995)).

In determining a child's habitual residence, the Third Circuit provides, "a child's habitual residence is the place

where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of 'settled purpose' from the child's perspective . . . . The determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Feder, 63 F.3d at 224.

The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and varies with the facts and circumstances of each case. Whiting v. Krassner, 391 F.3d 540, 546 (3d Cir. 2004). This standard focuses on the parents' shared intentions, the period of time sufficient for acclimatization and the child's degree of settled purpose. Harris v. Harris, No. 03-5952, 2003 WL 23162326, at *6 (E.D. Pa. Dec. 12, 2003).

## 4. Affirmative Defenses

Once a habitual residence is determined, a court is not required to return a child there, even if it finds that the removal or retention was wrongful. Karkkainen, 445 F.3d at 288. After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence. Id. These affirmative defenses are narrowly

8

construed to effectuate the purposes of the Hague Convention and, even where a defense applies, the court has discretion to order the child's return. Id. If a petitioner carries his burden under the Hague Convention and the court finds wrongful removal or retention, the burden shifts to the respondent to provide an affirmative defense, under article 13 of the Convention, against the return of the child to the country of habituation resident. Id.

There are two available affirmative defenses under article 13, each with a different burden of proof: (a) consent of acquiescence to the removal or retention, which must be proven by a preponderance of the evidence; and (b) grave risk of harm that return of child would expose child to physical or psychological harm, which must be proven by clear and convincing evidence. The latter is at issue here.

The grave risk of harm affirmative defense, under Article 13(b) of the Hague Convention, requires proof by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The Third Circuit Court of Appeals explained that a grave risk of harm exception encompasses "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation," but not "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's

preferences." <u>In re Application of Adan</u>, 437 F.3d 381, 395 (3d Cir. 2006).  For the grave risk exception to apply, the respondent must cite specific evidence of potential harm to the child upon his return. <u>Baxter</u>, 423 F.3d at 374.

**IV.  Analysis**

**1.  Petitioner's Prima Facie Case for Return of the Children**

**a. The date of wrongful retention of the children**

December 10, 2007, is the date of wrongful retention. On this day, Petitioner received a custody complaint from the Pennsylvania Court of Common Pleas and a temporary restraining order.  A subsequent hearing was held on December 14, 2007, where a Final Protection Order was issued.  Thus, December 10, 2007, was the first date that Petitioner knew or should have known that Respondent was not returning to Cyprus with the children.  It is this date when the children's retention in the United States violated Petitioner's custody rights.  <u>See</u> <u>Clarke v. Clarke</u>, No. 08-690, 2008 WL 2217608, at *4 (E.D. Pa. May 27, 2008) (finding that date of wrongful retention is when petitioner received custody complaint from state court).

**b. The children's habitual residence before the wrongful retention**

The children's habitual residence prior to the wrongful retention was Cyprus.  The children's habitual residence did not shift to the United States during the period since Respondent

retained the children.  The children were born in Cyprus and lived in Cyprus their entire lives.  The children attended school and had a familial relationships with Petitioner's family in Cyprus.

Respondent argues the children's habitual residence shifted from Cyprus the United States.  She contends that the children have adjusted and acclimatized themselves to their new home in Pennsylvania.  Under the standard laid out in <u>Feder</u>, the children's habitual residence has not shifted to the United States. <u>Feder</u>, 63 F.3d at 334.  A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization[6] and which has a

------

[6]    The standard for whether a child has sufficient time for acclimatization and has a 'degree of settled purpose' considers a child's experience in and contacts with his surroundings, focusing on whether the child "develop[ed] a certain routine and acquire[d] a sense of environmental normalcy" by "form[ing] meaningful connections with the people and places [he] encountered" in a country prior to the retention date. <u>Whitting v. Krassner</u>, 391 F.3d 540, 550-51 (3d Cir. 2004). It examines a child's conduct and experiences to determine whether he became "firmly rooted" in his new surroundings, not merely whether he acculturated to a country's language or customs. <u>Holder v. Holder</u>, 392 F.3d 1009, 1019 (9th Cir. 2004); <u>see also</u> <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1078-79 (9th Cir. 2001) (describing acclimatization as being "firmly embedded in the new country" or "being well-adjusted in one's present environment"). Simply put, this inquiry considers whether a child has made a country his home before the date of his removal or retention. <u>Karkkainen</u>, 445 F.3d at 292.

"degree of settled purpose"[7] from the child's perspective. Id. at

224. This standard focuses on the child and consists of any

analysis of the child's circumstances in that place and the

parents' present, shared intentions regarding their child's

presence there. Id.

Here, the parents never agreed the children would move

to Pennsylvania. They never discussed Respondent's intention to

retain the children in the United States and Petitioner never

consented to Respondent's permanent retention of the children.

During the time the parties were vacationing in the United

States, Petitioner continued to believe his family was returning

to Cyprus.[8] The family had round-trip airline tickets, much of

the children's belongings remained in Cyprus and the children

were enrolled in school there for the following year. The

evidence presented to the Court indicates, at the very least,

_____

        [7]    There must be a degree of settled purpose. The purpose
may be one or there may be several and it may be general or
specific. The law only requires that there is a settled purpose.
Education, business or profession, employment, health, family or
merely love of the place spring to mind as common reasons for a
choice of regular abode, and there may well be many others. All
that is necessary is that the purpose of living where one does
has a sufficient degree of continuity to be properly described as
settled. Feder, 63 F.3d at 223.

        [8]    It is not clear when Respondent first conceived of
remaining in the United States with the children, whether she had
"gone along" with the vacation idea in order to have Petitioner
allow her to leave Cyprus or decided to stay while she was
already in the United States.

that the parents did not share a parental intent to make the United States the children's habitual residence.

From November 23, 2007 (the date the family departed Cyprus) to December 10, 2007 (the date Petitioner received the Court temporary restraining order), the children did not "acclimatize" to the United States. The family initially came to the United States for an eight week vacation. Respondent did not stay at her own residence or have a job in the United States or hold legal resident status here.[9] The children were not enrolled

---

[9]     On July 22, 2009, Respondent and the couple's children were granted asylum by the United States Citizenship and Immigration Services (U.S. CIS). In light of this new development, Respondent argues that ordering Respondent and the children to return to Cyprus would be in violation of Section 1158(c)(1)(a) of the Immigration and Nationality Act. Respondent argues that her asylum status makes it impossible for the children to also be removed to Cyprus.

Federal courts have most commonly considered asylum and immigration status as it relates to the threshold question of "habitual residence." See Feder, 63 F.3d at 224. In the "habitual residence" inquiry, courts have considered the immigration status of the abducting parent. See e.g, Arguelles v. Vazquez (In re Haque Abduction Application), No. 08-2030, 2008 WL 913325, at *11 (D. Kan. 2008). "Even when significant connections to the United States are proven, the child's connections are undermined if neither the abducting parent nor the child are legal residents of the United States." Id. (citing Mendoza v. Miranda, 525 F. Supp. 2d 1182, 1195 (C.D. Ca. 2007)).

Courts have found that the threat of deportation is a constant danger to a child's well-being, potentially undermining every connection to his or her community. Id. Moreover, the fact that an abducting parent has sought asylum for herself and her child does not necessarily make the child's situation more stable. See e.g., Koc v. Koc, 181 F. Supp. 2d 136, 154 (E.D.N.Y. 2001) (finding a parent and her child's overstay of their visa indicates a child is not well-settled because "[t]he fact that

13

the Immigration Service may not be looking to deport them at this time does not, in any way, guarantee that that position will not change in the future or that [the mother or the child] will ultimately become legal permanent residents of this country."); see also Casimiro v. Chavez, No. 06-1889, 2006 WL 2938713, at *6 (N.D. Ga. Oct. 13, 2006) ("There is no assurance that Respondent will obtain legal resident status in the near future. [The minor child's] immigration status is derived from her mother's and is therefore also uncertain. Should any of the contingencies on which [the mother's] immigration status depends be decided against her, [the mother and the child] would be at risk for detention and deportation by U.S. Citizenship and Immigration Services-a result would disrupt [the child's] studies, her social life, and the life she has built with her mother's family in the United States.").

Specifically regarding asylum, other courts have indicated that a parent's application for asylum for herself and her children does not necessarily negate the impact of their tenuous immigration status as to whether the child is "well settled."  The Middle District of Florida, finding that the abducting parent and her children were illegal aliens who had filed petitions seeking asylum, "their residence in this country is not stable because neither [the mother] nor the children have legal alien status and, as such, are subject to deportation at anytime."  Lopez v. Alcala, 547 F. Supp. 2d 1255, 1260 (M.D. Fla. 2008); see also Arguelles, 2008 WL 913325, at *11 ("Respondent will not know whether her asylum application is granted for six to eight months and her lengthy and fluctuating road to asylum may well be a bumpy one. Considering all the factors, the court finds that [the child at issue] is not well settled in the United States.").

Here, the Respondent relies on § 1158(c)(1)(a) which prohibits removal of an asylee.  However, this prohibition against removal of an asylee is qualified by § 1158(c)(2), which provides that "[a]sylum granted under subsection (b) . . . does not convey a right to remain permanently in the United States . . . ." Subsection (c)(2) further provides that asylum "may be terminated if the Attorney General determines that," among other things, the alien no longer meets the conditions of subsection (b)(1) [i.e., no longer meets the definition of a refugee], has voluntarily availed himself of the protection of his native country, has acquired a new nationality, or meets a condition set forth in subsection (b)(2), which sets forth bars to asylum eligibility.  See 8 U.S.C. § 1158(b)(2), (c)(2).

in school or day care prior to December 10, 2007. The fact that the children may have attended community activities or bonded with family during this time period is not persuasive evidence that the children acclimated to life in the United States.

Respondent cannot take advantage of the time lapse before Petitioner filed the instant petition on November 18, 2008 as Petitioner filed an Application for Relief under the Hague Convention through the Cyprus Ministry of Justice on April 9, 2008, forty-five days after Respondent and children were supposed to return to Cyprus.[10]  It would be fundamentally unfair to allow Respondent to retain the children in the United States, without their father's consent, and then claim in court that children have grown accustomed to their new surroundings.  It is precisely this type of behavior that undermines the purpose of the Hague Convention.

_____

Thus, although the Respondent has temporarily been granted asylum, her asylum status is still tenuous.  Indeed, her own asylum approval letter indicates that her asylum status may be terminated at any time for a variety of reasons. (See doc. no. 44).  As in Casimiro, the children's immigration status is derived from Respondent's and is uncertain. 2006 WL 2938713, at *6.  The Court finds that Respondent's somewhat uncertain asylum status weighs against finding the United States as the children's habitual residence.

[10]  Petitioner filed this Application with the Cyprus officials.  The outcome of this petition.  However, Petitioner provided the Court with an order from a family court in Cyprus, dated February 13, 2009, ordering Respondent to return the children to Cyprus. (Pet'r. Ex., Cyprus Family Court Order, dated 2/13/2009.)

15

The children also do not have a "settled purpose" to reside in the United States. They do not have a "purpose of living where one has a sufficient degree of continuity to be properly described as settled." <u>Feder</u>, 63 F.3d at 223. The children were born and raised in Cyprus, they attended school and daycare there and had a home with their own rooms and toys. The children came to the United States purportedly on a vacation and their lives have been unsettled during their time here. The children have lived at their maternal grandparents' house at times, and it is still uncertain whether Respondent maintains a separate residence. Therefore, the Court cannot conclude that the children had a routine or a sense of environmental normalcy in the United States at the time of the wrong retention.

Under these circumstances, the Court finds that the children's habitual residence immediately prior to their wrongful retention was in Cyprus.

### c. Did the retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?

As the Court has found the children's habitual residence was in Cyprus, not Pennsylvania, Petitioner retained custody rights despite Pennsylvania's protection order relevant to the parties in this case. Accordingly, the wrongful detention of the children in the United States was a violation of the Petitioner's custody rights. (<u>See also</u> Pet'r. Ex., Cyprus Family

Court Order, dated 2/13/2009.)

### d. Was the petitioner exercising his custody rights at the time of the removal or retention?

Petitioner was exercising his custody rights at the time of the children's retention. Petitioner's burden here is minimal. See Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 277 (3d Cir. 2007) ("Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights."). A Petitioner meets his burden upon a showing that he kept, or attempted to keep, some sort of regular contact with the child. Id. (citing Baxter, 423 F.3d at 370).

The record is devoid of evidence that Petitioner had failed to exercise his custody rights at any point before the children were wrongfully retained. The evidence indicates Petitioner was involved in the daily lives of the children in Cyprus. Also, Petitioner appears to have provided the children financial and overall support for their care. The evidence further shows that Petitioner pursued civil and criminal remedies after the children were retained in the United States. Although the parties dispute the Petitioner's interaction with the children after the wrongful retention, the record shows that Petitioner has and continues to pursue avenues to be reunited with his children.

Accordingly, Petitioner has shown that Respondent

wrongfully retained the children in the United States, away from
their country of habitual residence - Cyprus.

**2. Grave Risk of Harm Affirmative Defense**

As noted above, grave risk requires proof by clear an
convincing evidence.  42 U.S.C. § 11603(e)(2)(A).  This exception
has been held to apply in at least two sets of cases: (1) "when
return of the child puts the child in imminent danger . . . e.g.,
returning the child to a zone of war, famine, or disease . . .;"
and (2) "cases of serious abuse or neglect, or extraordinary
emotional dependence, when the court in the country of habitual
residence, for whatever reason, may be incapable or unwilling to
give the child adequate protection."  Baxter, 423 F.3d at 373
(citing Friedrich, 78 F.3d at 1069).

The evidence presented at the evidentiary hearings
demonstrates that returning the children to Cyprus poses a grave
risk of physical or psychological harm to the children.
Petitioner's physical and emotional abuse throughout the duration
of the parents' marriage, the inability of the Cyprus authorities
to protect Respondent from abuse and Iliana's resulting
psychological disorder warrant the grave risk of harm
determination.[11]

---

[11]    Respondent cites two cases, both outside of the Third
Circuit, where the grave risk affirmative defense applied: (1)
Blondin v. Dubois, 19 F. Supp. 2d 123, 127 (S.D.N.Y. 1998)
(holding that the grave risk affirmative defense was applicable
where the children would be "exposed to physical or psychological

### a. Spousal Abuse

The evidence shows by clear and convincing evidence a grave risk of physical or psychological harm to the children or an otherwise intolerable situation. Respondent testified credibly about extensive physical and emotional abuse she suffered throughout her marriage.[12] She testified that the Petitioner beat her repeatedly and, at one point, broke her nose. She testified that she required surgery on her nose because of this incident.

Respondent also testified that Petitioner would drink heavily and become enraged at Respondent and the children.

---

harm" by their father, who has "repeatedly beaten [his wife], often in the presence of the children); and (2) Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (holding that grave risk affirmative defense applied because husband was "serial spousal abuser").

[12]     "Spousal abuse . . . is a factor [in the grave-risk inquiry] because of the potential that the abuser will also abuse the child." Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1057-58 (E.D. Wash. 2001). Quoting from Walsh, 221 F.3d at 220, Tsarbopoulos aptly explained:

> [C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers . . . . [B]oth state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser . . . . These factors are sufficient to make a threshold showing of exposure to physical or psychological harm.

176 F. Supp. 2d at 1058 (citations omitted).

Respondent testified that Petitioner kept a gun in the house and threatened to kill her. According to Respondent, Petitioner aimed the gun on her several times, but did not shoot.[13]

Petitioner admitted the two argued often and that he hit Respondent, but in self-defense. (Trial Tr. 78, 136-37, Feb. 18, 2009.) Petitioner denied abusing Respondent; however, the Court finds his testimony to be not credible. See supra fn. 3.

Respondent's testimony was supported by testimony from her mother, Irene Boritsaya. Ms. Boritsaya testified that, as a result of her visits to Cyprus with Respondent, she suspected there was significant spousal abuse in Cyprus. She added that she witnessed the abuse firsthand while the family was in the United States on vacation. She testified that at times Petitioner became highly agitated, yelled and cursed at the family. Specifically, Ms. Boritsaya testified that Petitioner

---

[13] One particular incident is illustrative of the combustible nature of the domestic relations between Petitioner and Respondent. Victoria Khaytin, Mrs. Boritsaya's upstairs neighbor in Philadelphia, testified that she heard Petitioner arguing loudly with Respondent on December 1, 2007, the day he was locked out of the apartment and forced to leave. Earlier that day Petitioner left the house to go to a bar or restaurant in the local neighborhood. When he returned, no one answered the door at Respondent's parents' apartment. Ms. Khaytin testified that she let the Petitioner into the building and that he smelled of alcohol. She testified that she heard loud arguments and called Respondent's mother to see what was wrong. Ms. Khaytin testified that, in light of the apparent volatile situation, she asked her husband to come downstairs to the apartment where Respondent was staying with her mother and sit with Respondent's family and pacify the situation. (Trial Tr. 164-170, Feb. 18, 2009.)

also pushed her and threatened to harm her and her family. (Trial Tr. 173-74, 181, Feb. 27, 2009.)

Respondent's evidence of spousal abuse compels a finding that the grave risk of harm affirmative defense applies here. See, e.g., Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005) (reversing order of return where the father had "beat[en] his wife severely and repeatedly in [the children's] presence," and also threatened to kill them); Walsh, 221 F.3d at 219-20 (reversing order of return where father was psychologically abusive and had severely beaten the children's mother in their presence); Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 398-400 (E.D.N.Y. 2005) (refusing return where father frequently hit the children, threatened to kill his son, and severely abused their mother in their presence); Rodriguez v. Rodriguez, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (refusing return where child had been belt-whipped, punched, and kicked, and where the child's mother had been subjected to more serious attacks, including choking her and breaking her nose).

### b. Cyprus Authorities

Respondent also testified that while in Cyprus she was afraid to call the authorities because she feared the local police, who were well acquainted with Petitioner, would not help. She testified that she once called the police and filed a police report. However, she testified that the Petitioner threatened to

"throw her out of [Cyprus]" and she was forced to recall her complaint. (Resp't Br., doc. no. 58 at 4.)  Moreover, Respondent, a Russian citizen, testified that she has no legal citizenship status in Cyprus and was uncertain if she had proper legal standing to fight a custody battle there.

Thus, there is evidence that the Cyprus authorities were unable or would have been unwilling to protect Respondent. See In re Adan, 437 F.3d 381, 397 (3d Cir. 2006) (noting that district courts must consider testimony and evidence regarding the willingness and ability of the local authorities in habitual residence to protect the parties from abuse).

### c. Iliana's Post Traumatic Stress Disorder

Respondent testified that her daughter, Iliana, began having night terrors and wetting the bed as a result of the stress from the violence she witnessed.  The Court heard testimony from Dr. Igor Davidson, a licensed psychologist, who evaluated Iliana.  Dr. Davidson submitted a report and testified that Iliana suffers from Chronic Post Traumatic Stress Disorder ("PTSD").  Dr. Davidson's report indicated that "Iliana was referred for a comprehensive psychological evaluation following a period of nervousness, unprovoked crying spells, appearing to be 'in her own world', occasional aggression, fearfulness, nightmares and avoidance." (Resp't Ex., Davidson Rep.)

Dr. Davidson administered two psychological tests, the

PTSD Inventory and the Conner's Rating Scale.  The PTSD test was designed as a tool for use in diagnosing children with PTSD. Based on the test results, Dr. Davidson testified that "Iliana's signs and symptoms best fit a post traumatic stress disorder of a chronic variety." (Trial Tr. 30:3-5, Oct. 29, 2009.)  Dr. Davidson also testified that Iliana's PTSD condition was connected to the family violence she observed. (Id. at 31.)

As part of the PTSD test, Dr. Davidson asked Iliana, "Have you seen a scary thing happen to someone else?" (Id. at 37:22-23.)  Iliana responded that she had.  Dr. Davidson, as per procedure the of PTSD test, asked the follow up question, "tell me about it." (Id. at 38:1.)  Iliana responded, "A long time ago, Mama and Papa were fighting, everybody was screaming. Papa was screaming. He pulled Mama's hair and choked her." (Id. at 38:2-4.)  Iliana also answered that she was scared and upset when this incident occurred. (Id. at 38-39.)  She admitted that she was having many upsetting thoughts about the incident she described, pictures of the incident keep popping into her head, and she has bad dreams about the incident. (Id.)

Dr. Davidson confirmed Iliana's responses with reports from Respondent, as well as other information related to the instant case.  Dr. Davidson also administered the Conner's Rating Scale to the Respondent and Iliana's schoolteacher.  According to the report, "Iliana is functioning in the 'typical score' to

23

'indicates significant problem' range on all scales of the
Connor's Parents Rating Scale. Areas of most concern according
to maternal report were Anxious-Shy, Emotional Lability and
Hyperactivity." (Resp't Ex. 1, Davidson Rep. 3.)

Dr. Davison concluded that "Iliana's emotional and
psychological problems are founded on the duress she incurred as
a witness to her mother's abuse. It appears that in the present
day, this condition continues to constitute significant personal
distress for Iliana and interfere with adequate social growth
with adults and peers." (Id.) Dr. Davidson recommended a
stable, consistent, structured and safe family environment.
Finally, Dr. Davison warned against Iliana's return to Cyprus. "A
return to Cyprus will subject Iliana to particularly those
persons, places and stimuli which founded her current
difficulties and as such is likely to result in severe
psychological and emotional duress for Iliana[.]" (Id. at 5.)

Dr. Anthony Pisa, a licensed psychologist, with an
expertise in forensic psychology, testified for the Petitioner.
Dr. Pisa reviewed Dr. Davidson's report and testified as to some
problems in the Davidson report. (Pet'r Ex., Pisa Rep.) Dr. Pisa
found that Dr. Davidson failed to: (1) evaluate the manner in
which Iliana generally perceives her world; (2) explore Iliana's
ability to accurately recall recent events as well as other
salient events that occurred in her life; (3) explore Iliana's

concept of time; (4) fill in an answer for every question on the PTSD test; (5) consider the discrepancies between the teacher's ratings of Iliana's behavior and Mother's rating of Iliana's behavior as the Mother appears to rate Iliana's behavior as more pathological when compared to the teacher's rating; and (6) correctly add points on the Teacher Rating Scale. (Id.)

Dr. Pisa testified that he never met Iliana or Respondent, nor personally evaluated Iliana. In forming his report, Dr. Pisa relied on Dr. Davidson's report, Petitioner's instant motion, the deposition of the paternal grandmother, the transcript of the Protective Order hearing in the Philadelphia Court of Common pleas and proposed findings of fact and conclusions of law by Petitioner. Dr. Pisa did not read any responses or documents crafted by the Respondent.

Furthermore, Dr. Pisa admitted that he was unable to testify to a degree of medical certainty as to whether or not Iliana is, in fact, suffering from PTSD. (Trial Tr. 138:18-22, Oct. 29, 2009.) Dr. Pisa did not contradict Dr. Davidson's diagnosis of Iliana regarding her Chronic PTSD. Dr. Pisa also admitted that he was unable to testify as to whether or not Iliana needs psychological treatment or make any recommendations for Iliana. Id. at 138-139.

Although Dr. Pisa points out certain irregularities with Dr. Davidson's administration and evaluation of the two

tests, the two expert opinions are not irreconcilable.  Dr. Pisa

does not conclude that Dr. Davidson's report is fatally flawed,

that Iliana does not have PTSD or that Iliana should be returned

to Cyprus.[14]

Therefore, the Court relies on Dr. Davidson's expert

opinion that Iliana is suffering from Chronic PTSD as a result of

the family violence she witnessed in Cyprus. See Danaipour v.

McLarey, 286 F.3d 1, 17 (1st. Cir. 2002) (explaining that a

finding that a child suffers from PTSD and would deteriorate if

returned to the country of habitual residence could be evidence

tending to support a finding of grave risk under Article 13(b))

(citing Blondin, 238 F. 3d 163.); see also Walsh, 221 F. 3d 204,

---

[14]     Petitioner parallels this case to the Clarke case where
Dr. Pisa's testimony was relied on to find there was no grave
risk of harm defense. Clarke, 2008 WL 2217608, at *8-9.

    In that case, one licensed psychologist testified for
the respondent mother, that she believed the petitioner father
was sexually abusing his children.  On cross-examination, several
audio tapes were played that indicated that psychologist's
practices were overly suggestive to the child she interviewed and
designed to lead him to say that his father abused him.  Dr.
Pisa, testifying for the petitioner father, concluded that the
child had not been sexually abused.  Rather, he felt that the
child's misbehavior was a result of several traumatic events the
family experience. Id.  The Clarke court also relied on other
evidence to dismiss the original psychologist's opinion,
including audiotapes of the child's evaluation.  Finally, the
Clarke court found that the Australian (the habitual residence in
that case) police were suited to respond to any concerns of
sexual abuse. Id. at *9.

     In the instant case, Dr. Pisa made no such similar
conclusion that directly contradicted Dr. Davidson's diagnosis.

211-12, <u>Elyashiv</u>, 353 F. Supp. 2d at 418-419 (finding that an expert's opinion that children suffering from PTSD would deteriorate if returned to country of habitual residence warranted the application of grave risk of harm affirmative defense).

Returning Iliana to Petitioner's residence would likely expose her to a grave risk of both physical and psychological harm. This is so, given her witnessing her father's abuse of their mother and the uprooting from her new home in the United States to the country where she observed physical and emotional abuse. This would be coupled with the relapse she would suffer of her PTSD disorder.

Similar to <u>Blondin</u>, in light of the sole, unimpeached and uncontroverted testimony of Dr. Davison that Iliana's return to Cyprus would trigger her PTSD, there is no need for the Court to consider alternative living arrangements or reach out to the Cyprus authorities for their input.

Even though there has been no definitive evidence that Achilleas, the now five-year-old male child of Petitioner and Respondent, suffers from PTSD, returning him to Cyprus would also expose him to a grave risk of physical and psychological harm. In respect to physical harm, Achilleas is not insulated from the likelihood of future abuse, given Petitioner's inability to control his temper, his pattern of domestic abuse and his

27

threats.  As for psychological harm, since his sibling, with whom he has lived all of his life, would remain in the United States, and presumably his mother as well, a separation from his mother and sibling is likely to cause him harm.[15]

Under these circumstances, the Court finds that Respondent has satisfied the grave risk of harm affirmative defense by clear and convincing evidence.

**V. Conclusion**

In light of the Court's conclusion that the grave-risk exception under Article 13(b) of the Convention applies, the petition is denied.  An appropriate order follows.

---

[15]     In Blondin, the district court noted that the expert explained that the younger child, who was four, did not exhibit any "clear manifestations of traumatic stress-disorder . . . because he would probably have been too young to remember it or be able to verbalize it." 78 F. Supp. 2d at 291 n.9.  The court, nonetheless, commented that it "will not separate the children[.]" Id.  (citing Aristotle P. v. Johnson, 721 F.Supp. 1002, 1005-06 (N.D. Ill. 1989) ("[C]hildren['s] relationships with their siblings are the sort of 'intimate human relationships' that are afforded 'a substantial measure of sanctuary from unjustified interference by the State.'") (quoting Roberts v. United States Jaycees, 468 U.S. 609, 618 (1984))). The court's decision, as well as the Second Circuit's affirmance, proceeded on the basis that both children would experience post-traumatic stress disorder if returned to France.

Under the unique facts of the instant case, the Court declines to consider the challenging prospect of having to determine whether suitable arrangements by governmental authorities could be arranged for one, but not both, siblings, requiring their separation.